PUERTO RICO ILUSTRADO, INC., Plaintiff and Appellee-Appellant, v. RAFAEL BUSCAGLIA, TREASURER OF PUERTO RICO, Defendant and Appellant-Appellee.

No. 9042. Argued March 5, 1945.—Decided May 4, 1945.

*Jesús A. González, Acting Attorney General,* and *G. Benítez Gautier, Assistant Attorney General,* for appellant-appellee. *R. Cuevas Zequeira* for appellee-appellant.

Mr. Justice Snyder delivered the opinion of the court.

In 1942 the Treasurer of Puerto Rico demanded payment by Puerto Rico Ilustrado, Inc.,[1] of $163,987.74, as excise taxes, penalties, and interest on various articles brought into

---

[1] Hereinafter referred to as the Ilustrado.

Puerto Rico by the Ilustrado during the previous seventeen years. The notice of the Treasurer warned that he would proceed under § 105 of the Internal Revenue Law—which provides for attachment and sale at public auction of the property of a taxpayer who fails to pay the taxes laid thereunder—if payment were not made within ten days. However, this period of time was extended several times while the parties discussed the situation. Thereafter, the Ilustrado paid several thousand dollars without protest and the Treasurer reduced substantially the amount he was demanding. The Ilustrado thereupon paid the sums of $68,221.94 and $43,664.95 under protest and filed these two suits for refund. After a trial on the merits, the district court entered judgments from which both parties have appealed in part.

## I

■■ The Ilustrado is devoted almost exclusively[2] to the publication, distribution, and sale of two daily newspapers —"El Mundo" and "The World Journal"—and a weekly magazine, "Puerto Rico Ilustrado."[3] In view of these facts, the corporation contends that none of the articles brought into Puerto Rico by it are subject to the excise taxes levied thereon by the Treasurer. The Ilustrado bases this contention on § 83 of the Internal Revenue Law. That Section provides that the taxes prescribed by §§ 62 and 16a of that Act shall not attach to the "sale of newspapers, newspaper advertisements and literary scientific and philosophical works and school text books."[4]

We agree with the district court that this contention is without merit. The exemption found in § 83 is restricted to

[2] Certain sporadic transactions of alleged "sales" of raw materials to competitors are hereinafter examined in detail, VII, *infra*.

[3] The Ilustrado also prints, presumably for the duration of the war, two publications of the armed forces, Yank and Caribbean Sentinel; but we find nothing in those facts relevant to the controversy herein.

[4] Act No. 83, Laws of Puerto Rico, 1931; Act No. 4, Laws of Puerto Rico, 1939, Special Session.

the sale of the finished product. We find nothing in it providing for an exemption from excise taxes on the raw materials used in fashioning the publications or the mechanical machinery required thereof. We are not authorized to grant to the Ilustrado an exemption beyond that conferred by the Legislature, which knew how to extend the scope of such an exemption when it wished to accomplish that end (see § 83, exempting the "sale of fertilizers, as well as all raw materials used in the manufacture of fertilizers").

Tax exemptions cannot be inferred; they must be specifically provided for in plain and unambiguous language. (*Monllor & Boscio, Sucrs.* v. *Sancho, Treas.*, 61 P.R.R. 63; 1 Mertens Law of Federal Income Taxation, §§ 3.01, 3.07; *United States* v. *Stewart*, 311 U. S. 60, 71; *New Colonial Co.* v. *Helvering*, 292 U. S. 435.) We find no such specific language in § 83. Section 83 exempts the sale of the end product—the newspaper itself—and nothing more. The contention of the Ilustrado must be rejected.

## II

We therefore turn to the contentions of the parties as to each of the articles involved herein. The Treasurer argues that the Ilustrado was required to pay a 10 per cent excise tax on a rotary press and the parts therefor brought to Puerto Rico by the Ilustrado and used by it to produce its periodicals. The pertinent statute—paragraph 27 of § 16 of the Internal Revenue Law as amended by Act No. 83, Laws of Puerto Rico, 1931—reads as follows:

"*Electric fans and ventilators, and electric or fluid gas refrigerators and stoves.*—On all electric fans or ventilators and electric or fluid gas refrigerators and stoves, and automatic apparatuses operated by fluid gas or electricity, sold, transferred, manufactured or used in or introduced into Porto Rico, a tax of ten (10) per cent on the selling price." [5]

---

[5] The legislative history of this paragraph, which began as paragraph 41 of § 16 of the Internal Revenue Law (Act No. 85 of 1925) and is now

The first question to determine is whether a rotary press is automatic. The district court summarized the testimony on this point as follows: "According to witness A. Ramos [who testified for the Ilustrado], although the machine is operated by electricity, it requires the constant attention of a workman to operate and stop it; paper and ink must be fed to the machine; when the paper is exhausted or the machine breaks, it must be stopped in order to feed or change the paper; likewise, when the ink is exhausted, the machine must be stopped in order to supply it with more ink; in addition, it must at times be adjusted. According to Mr. Fragoso [who testified for the Treasurer], 'the rotary takes the paper, makes the newspaper, throws it out, and folds it, no human agency being necessary in order to print the same, except only to start the machine.'" (Matter in brackets ours.)

For us to hold that this testimony warranted the conclusion that a rotary press is not automatic would require us to find that the Legislature meant that nothing is automatic which requires human intervention, however slight, in its operations. This is almost—though perhaps not quite—an argument that by "automatic" the Legislature meant "perpetual motion." We think the Legislature had a wholly different view in mind. In our opinion, it was not concerned with the scientific implications of the word "automatic." It was, we believe, expressing the notion of the average person who, observing the vast congerie of household and industrial articles spawned by modern science and industry, thinks of "automatic" as something novel which has displaced an article which previously performed the same function in some less mechanical fashion.[6]

---

paragraph 20 thereof (Act No. 25 of 1942, Third Special Session), is traced in detail in III, *infra*. Here we need only note that the 1931 text is substantially controlling for purposes of the present case.

[6] Our view is in conformity with the definition in Webster's New International Dictionary, Second Edition:

"Automatic—1. Having an inherent power of action or motion.

That this ordinary meaning of the term "automatic" was intended by the Legislature becomes evident when we examine the kind of articles specifically taxed under paragraph 27.[7] Fans, refrigerators, and stoves require installation, commencement, adjustment, repair, and stoppage by human intervention. We cannot agree with the district judge who, apparently conceding that these appliances were automatic, nevertheless thought that a rotary press when compared to them was not automatic. If anything, we feel that, in the light of the complicated operations of a rotary press, it is more automatic[8]—in the practical sense the Legislature used the term—than the simple household articles specifically listed in paragraph 27. No layman who observed such a press run off thousands of papers in the few minutes required therefor would think of calling its operations anything but automatic. We therefore have no hesitancy in holding that

2. Mach. Having a self-acting or self-regulating mechanism that perform a required act at a predetermined point in an operation;—*said esp. of machinery or devices which perform work formerly or usually done by hand;* as, the automatic feed of a lathe. . . ."

"Automatic machine. A machine or machine tool which, after once being set, operates automatically *except for applying the power, lubricating, supplying material, and shutting off the power.*" (Italics ours.)

As a case cited by the Ilustrado itself points out, "automatic" means "without the *continued* application of human agency" (*State* v. *Louisville & N.E. Co.*, 96 N.E. 340, 344 (Ind., 1911; italics ours); that is, "automatic" contemplates substantial reduction—not necessarily total elimination—or manual intervention.

[7] We are aware that, in resorting to the other articles taxed by paragraph 27 as an aid to determine the meaning of "automatic", we are using the approach of *ejusdem generis*. See III, *infra*. But if the rule of *ejusdem generis* colors—and restricts—the meaning of "apparatus", it must necessarily do the same to the adjective "automatic" which precedes "apparatus". The Treasurer would have us apply *ejusdem generis* only to the adjective "automatic"; the Ilustrado would have us apply it only to "apparatuses operated by electricity." We apply the rule to the phrase as a whole, not piecemeal to suit the theory of either party. On the point now before us, it goes against the Ilustrado.

[8] The phrase "more automatic" may horrify grammarians; but the view we take of "automatic" as used in this statute requires us to speak of degrees thereof.

a rotary press is automatic within the meaning of that term as used in paragraph 27.

## III

█ We come next to the following problem: did the use of the phrase "automatic apparatuses operated by fluid gas or electricity" in paragraph 27 result in making a rotary press taxable at 10 per cent under that paragraph? Invoking the rule of *ejusdem generis* and the related doctrine of *noscitur a sociis,* the district court held that the Legislature meant to use that general phraseology only as a catch all for either articles which, although not among those specifically taxed in paragraph 27, were of the same class or kind as those actually listed in detail in that paragraph; and by the same token, the Legislature did not mean to cover by that general phrase articles of a wholly different and superior class than those specifically listed in the paragraph.

The district court therefore concluded that since a rotary printing press, costing more than $100,000, was obviously not the same kind of merchandise as an electric fan, ventilator, refrigerator or stove, but rather of a different and a superior class, the Legislature did not intend to impose a 10 per cent tax thereon by paragraph 27. The Treasurer complains of this action of the lower court. He asserts that the rule of *ejusdem generis* does not apply to the general phrase "automatic apparatuses" found in paragraph 27, and that a rotary press is therefore taxable at 10 per cent as such an "apparatus".

It is not difficult to state the rule of statutory construction embodied in the thumbasil phrase *ejusdem generis,* meaning literally "of the same kind or species." [9]  2 Sutherland. Statutory Construction, 3rd ed., puts it like this (p. 395):

---

[9] We do not subscribe to the theory that magisterial pronouncement of this maxim produces without more the solution to complicated problems of statutory interpretation. We are aware that "... the maxim has declined in prevalence and importance, now that the truths of the law have become too complex to be forced within a sentence ...." (Cardozo, Law and Literature, 52 Harv.

"Where general words follow specific words in an enumeration describing the legal subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." The rule (p. 399) "accomplishes the purpose of giving effect to both the particular and the general words, by treating the particular words as indicating the class, and the general words as extending the provisions of the statute to everything embraced in that class, though not specifically named by the particular words."

"The doctrine applies when the following conditions exist: (1) the statute contains an enumeration by specific words: (2) the members of the enumeration constitute a class; (3) the class is not exhausted by the enumeration; (4) a general term follows the enumeration; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires." (P. 400.)

Testing paragraph 27 by these requirements, we find that (1) it specifically enumerates electric fans, ventilators, refrigerators, stoves; (2) these articles belong to a class—household articles; (3) the class is by no means exhausted by the enumeration—other similar household articles such as washing machines, ironing machines, vacuum cleaners, electric heaters, cake mixers, deep freeze units, hair dryers [10]

---

L.Rev. 471, 478.) But the vitality of the rule of *ejusdem generis* cannot be lightly brushed aside. It may be "shop-worn" (*National Labor Relations Board* v. *Newark Morning Ledger Co.*, 120 F.(2d) 262, 275 (C.C.A. 3, 1941)); and "depending as it does on pure form," it may provide "a dangerous yardstick with which to measure the statutory coverage which the legislature intended." (2 Sutherland, Statutory Construction, 3rd ed., p. 401.) Nevertheless, it has its roots both in logic and in the meaning of language. And more important, it is distilled from experience; the sheer volume of cases invoking *ejusdem generis* (American and Federal Digests, Statutes, key-number 194; 2 Sutherland, *supra*, cases in footnotes, pp. 393–412) is eloquent testimony that legislation is constantly enacted—and read by those concerned—with this rule which is founded on reason, grammar, and language in mind. It has frequently been applied to tax statutes. 1 Mertens, *supra*, § 3.16. See generally, *Domínguez* v. *P.R.Ry., Light & Power Co.*, 19 P.R.R. 1034, 1038; *Flores Alvarez & Co.* v. *Gallardo*, 36 P.R.R. 105, 109; *Canet* v. *District Court*, 61 P.R.R. 146, 153.

[10] That some of these articles may not yet have reached the market in 1931, when the general phrase herein was first enacted, does not militate against their coverage. On the contrary, the very purpose of the general phrase, as

readily come to mind; (4) "automatic apparatuses operated by electricity"[11] is a general term following the detailed enumeration; and (5) there is nothing in the statute manifesting an intent that the general term be given a broader meaning that the doctrine requires.

The application of *ejusdem generis* to the facts herein would therefore seem clear. Nevertheless, we deem it appropriate to examine in detail certain contentions that might be made to the contrary in connection with the foregoing five requisites. As to the first and second, the argument might conceivably be made that the Legislature did not intend to attach to the general term used here a restricted meaning, because "the members of the enumeration, although specific, are essentially diverse in character". (Sutherland, *supra*, p. 404.) That theory is predicated on a professed inability to find an *idem genus* into which the items taxed in paragraph 27 all fit. We cannot agree. We recognize that some of these articles might be used in an office or public building rather than a home. But all of them are mechanical contrivances operated by power for human comfort or tastes. The *genus*, concededly broad,[12] exists; and the articles specifically enumerated—and others not listed—fall

contemplated by the rule of *ejusdem generis*, is that specific articles—either overlooked or not yet produced, but of the same general nature as those specifically listed—are included within the general phrase and thereby made taxable when they do reach the market.

[11] We occasionally use this short form of the general phrase hereinafter for the sake of brevity.

[12] Undoubtedly "apparatus", standing alone, is a word of the broadest connotations. It is so general and comprehensive that, as defined by Webster's International Dictionary, Second Edition, it can be used in certain contexts to include "Any complex instrument or appliance, mechanical or chemical, for a specific action or operation; *machinery;* mechanism." (Italics ours.) See *Hinckley-Tandy Leather Co.* v. *Hazelwood*, 35 S.W. (2d) 209, 211 (Tex., 1931); 14 Words and Phrases, pp. 660–64. But the point here is precisely whether it was so used in its unqualified meaning, or rather whether it took color from and was restricted to the same kind of articles which preceded it in the specific enumeration. As a neutral word of indefinite content, it could have been used in either sense. It is our duty to ascertain which meaning the Legislature intended to give it.

within it. That exception to the rule of *ejusdem generis* therefore does not apply here.[13]

The instant case easily meets the test of the third requirement.[14] The specific words—electric fans, ventilators, refrigerators, and stoves—do not exhaust the articles "of the class designated by the enumeration". On the contrary, as we have seen, a number of other similar articles fall within the same class. The general words—automatic apparatuses operated by gas or electricity—have a function to perform: coverage of other objects of the same class not specifically mentioned in the statute. There is therefore no basis on which to give them another, and unrestricted, meaning.

The fourth requirement needs no discussion. The phrase here is undoubtedly a general phrase following a specific enumeration.[15] The only question is whether it has a broad or a restricted meaning. And that depends primarily on our conclusion as to whether the other four requisites of *ejusdem generis* have been fulfilled.

[13] We note in passing that other exceptions to the rule—for example, where no enumeration is attempted, or where the enumeration is merely illustrative (2 Sutherland, *supra*, p. 403; *Grosjean* v. *American Paint Works*, 160 So. 449 (La.App., 1935); see *Tugwell* v. *District Court*, 64 P.R.R. 213)—are clearly not involved here.

[14] 2 Sutherland, *supra*, gives the reason for this requirement at pp. 405-7: "Where the specific words embrace all the persons or objects of the class designated by the enumeration, the general words take a meaning beyond the class. To apply the rule in this instance would render the general words meaningless for the reason that there is nothing *ejusdem generis* to fall within their purview. Its application, consequently, would contravene the more important rule of construction that all words are to be given effect. In order to prevent their rejection as surplusage, the general words take an unrestricted meaning on the ground that the legislature, by the addition of general words to an exhaustive enumeration, must have intended that they have meaning outside the class." He describes it again in somewhat different language at p. 403: ". . . where the specification of those objects classed as inferior is exhaustive and general words are added, then objects of a superior nature are embraced within the meaning of the general words so as to prevent their rejection as surplusage."

[15] See *infra*, for discussion of the effect of the transposition—by a 1936 amendment of paragraph 27—of the general phrase from the close of the enumeration to the middle thereof.

We are acutely aware that the fifth requirement is of the utmost importance. All the learning about *ejusdem generis* has no significance if the statute contains a clear manifestation of a contrary intent. Like other rules of statutory construction, *ejusdem generis* is only an aid.[16] "If, upon a consideration of the context and the objects sought to be attained and of the act as a whole, it adequately appears that the general words were not used in the restricted sense suggested by the rule, we must give effect to the conclusion afforded by the wider view in order that the will of the legislature shall not fail." (*Helvering* v. *Stockholms &c. Bank,* 293 U. S. 84, 88, 89, quoted in 2 Sutherland, *supra,* p. 409.) In addition, "the rule of *ejusdem generis* will not be applied if it results in a construction inconsistent with the statute's legislative history, other controlling rules of construction, or statutes *in pari materia.*" (Sutherland, *supra,* pp. 410–12.)

But here (*a*) the wording of our statute, (*b*) the position of the general words in the statute, (*c*) the title, (*d*) the legislative history and (*e*) statutes *in pari materia* do not show a contrary intent. Rather they all contain signposts pointing in the direction of *ejusdem generis* and reinforce its application in this case.

First, we take (*a*) the wording of paragraph 27 and (*b*) the position of the general phrase therein. Reading paragraph 27 to ascertain as best we can the legislative intent, we find it difficult to escape the conclusion that "automatic apparatuses operated by fluid gas or electricity"—coming immediately at the end of a specific list of articles, "electric fans or ventilators and electric or fluid gas refrigerators and stoves"—was anything more than a clean-up phrase to include all articles of a similar nature not specifically enumerated. Fans, refrigerators, and stoves are household conveniences purchased at comparatively modest prices; no one could possibly put them in the same class with ponderous .

---

[16] Cf. *Bowie* v. *Buscaglia,* 63 P.R.R. 525, 530; *Tugwell* v. *District Court,* 64 P.R.R. 213.

and expensive industrial machinery such as rotary presses and tremendous turbines, which are virtually plants in themselves. We simply cannot conceive of an ordinary person—reading the aforesaid general phrase in its context of specifically enumerated articles—concluding that it covered a rotary press as well as household gadgets.[17]

And while we have no desire to emphasize matters of form, the Legislature gave no hint or warning that the general phrase "automatic apparatuses operated by fluid gas or electricity" was a separate—and exceedingly broad—classification of its own with no relation to the detailed list of articles immediately preceding it. That might perhaps have been accomplished by setting it apart from the other articles listed therein by including it within semi-colons; or better still, by putting it in its own separate paragraph.[18] Instead it was inserted at the close of paragraph 27 and was separated from the specified articles only by a comma. This is almost universally the way in which general words are written in a statute when the legislature means for such words to partake of the restricted meaning of previous specific words. The conclusion would therefore seem irresistible that our Legislature was using language in the manner experience and grammar teach us other legislative bodies have used it.[19]

---

[17] An obvious corollary of the *ejusdem generis* rule, which is bottomed on the theory that general words include only articles of the same class as those specifically enumerated, is that "the general words will not include any objects of a class superior to that designated by the specific words." (2 Sutherland, *supra,* p. 401.)

[18] See footnote 26.

[19] We recognize that most cases upholding the doctrine of *ejusdem generis* have interpreted statutes in which the clean-up phrase has been linked to the preceding enumeration by "other," or some equivalent word. (Crawford, Statutory Construction, p. 327, footnote 73.) But we know of no reason—and we have found no case which so holds—why the absence of such a connecting word is fatal. Perhaps if the list in paragraph 27 had concluded "and *other* automatic apparatuses operated by electricity," it would have been so clear that a rotary press was not thereby included that the Treasurer would not have made the present belated effort to apply paragraph 27 thereto. But the absence of "other" or some similar word is not decisive; all the other

We turn next to *c*—the title of the statute. There is no rule that each paragraph of a tax statute must have a proper title or even any title at all. But our Legislature has chosen to supply titles for the paragraphs of § 16. And "If the act were at all doubtful, it would be aided by its title . . . "[20] From 1931 when the general phrase involved was first written into paragraph 27 by Act No. 83 of 1931 until 1942, the title of this paragraph read substantially as provided in the said Act No. 83, "Electric fans and ventilators, and electric or fluid gas refrigerators and stoves"—not a word about "automatic apparatuses operated by gas or electricity." This is still another indication that the general words were a clean-up phrase to catch all articles of a similar nature, and were not intended to include whole power or printing plants—costing hundreds of thousands of dollars — not specifically mentioned therein.[21]

---

factors noted herein are equally important in determining the intent of the Legislature.

We add that, in determining the intent of our Legislature in passing a specific statute, cases from other jurisdictions are of limited usefulness. In the end the conclusive factors are the language and purpose of the statute itself.

[20] *South P.R. Sugar Co.* v. *Treas. of P.R.*, 26 P.R.R. 446, 453; 2 Sutherland, *supra*, p. 344.

[21] The Legislature apparently recognized the force of the argument that the absence of any reference to automatic apparatuses in the title of paragraph 27 weakened considerably the theory that the said general phrase had an independent unrestricted meaning of its own apart from and broader than the specific list of articles which it followed. In 1942—after the controversy in this case arose—the Legislature, either independently or at the suggestion of some administrative official, attempted to remedy this defect. "Automatic apparatus operated by gas or electricity" was inserted in the title of paragraph 27 (the number of the said paragraph had already been changed to 26 by Act No. 158 of 1941) by Act No. 25, Laws of Puerto Rico, 1942, Third Special Session. No substantial change was made in the body of the paragraph itself—either in the words or in their arrangement, except to raise the rate of taxation to 15 per cent. Whether such a change in the title alone would be sufficient to broaden the meaning of the general phrase in the body of paragraph 27 to the extent of freeing it from the rule of *ejusdem generis*, we need not decide here. The 1942 amendment operated prospectively, and could not affect tax liabilities alledgedly accruing from 1925 to 1941. For our purposes, the amendment was a half-hearted attempt to shore up a structure that was not there.

Likewise, (d)—the legislative history· of paragraph 27, as to text as well as to title—furnishes no comfort to the Treasurer. This paragraph started as paragraph 41 of § 16 in the Act of 1925. It imposed a 7% tax only on electric fans or ventilators; and it included in its title only electric fans and ventilators. By Act No. 17 of 1927 (Laws of P. R., 1927, Second Special Session) its paragraph number was changed to 27, and "introduction," as well as sale or use, was taxed. Act No. 83 of 1931, for our purposes herein, put paragraph 27 substantially in its present form. The rate of taxation was increased to 16%, and manufacture in Puerto Rico was added to the taxable events. But the important changes, for purposes of the instant case, were that "electric or fluid gas refrigerators and stoves" were added to "electric fans or ventilators", which were already taxable; and at the close of the expanded new list, there appeared for the first time the general phrase, "automatic apparatuses operated by fluid gas or electricity". The title of paragraph 27 was expanded to include refrigerators and stoves; but the title continued significantly silent—this continued, as we have seen, until 1942—as to the general phrase just added to the paragraph.

In Act No. 108, Laws of Puerto Rico, 1936, the Legislature amended paragraph 27 to provide for a 10% tax on all parts and accessories for the articles taxed herein. In addition, it changed the position of the general phrase "automatic apparatus operated by gas or electricity." [22] This phrase was transferred from its previous position at the end of the detailed list, and was placed in the middle of the list, which then read "On all electric fans or ventilators, automatic apparatuses operated by gas or electricity, refrigerators and stoves of all kinds, and on all parts and accessories for the articles herein described . . ."

It is difficult to determine the significance, if any, of this curious action of the Legislature in transposing the general

---

[22] The word "fluid" before "gas" was eliminated from the English version, but it remained in the Spanish text. We find no significance in this discrepancy.

phrase. In any event, while we recognize that the clean-up phrase almost invariably comes at the close of a list of specific articles—Sutherland, *supra,* says at p. 395, the general words "follow" the specific words—we find it difficult to believe that by this single, casual change in the order of the items listed in paragraph 27 the Legislature meant to take the radical step of reversing itself completely as to all that had gone before and to give to the very same general phrase —which it had always used previously in the restricted *ejusdem generis* sense—a new, broad and unqualified meaning. This dilemma might be simply a product of a typographical slip at some stage of the legislative process. But it cannot be gainsaid that the Legislature made the change; we must therefore, if we can, find some meaning in it. The most plausible conclusion we can reach under all the circumstances is that the Legislature at the most had in mind that the general phrase was an appropriate catch all for articles of the same nature as those it now followed in the statute—"electric fans or ventilators"; but that it no longer desired to have it serve this purpose—perhaps deeming it inappropriate therefor—for refrigerators and stoves, some of which do not operate by gas or electricity. It may or may not continue to include articles of the same kind as refrigerators and stoves. That question is not before us and we leave it open. We hold only that putting it in the middle of the list after electric fans or ventilators did not in itself thereby give it a startlingly new meaning sufficiently broad to include a rotary press.

The change in the title made by Act No. 108 of 1936 supports this view. The Legislature carefully inserted "parts and accesories" in the title. But the title, as we have seen, never contained a word about "automatic apparatuses operated by gas and electricity" until 1942, which was after the alleged taxable event occurred herein and after this controversy arose. And as hereinafter noted, despite this 1936 amendment, the position of the Treasurer, originally taken

in 1931, that the general phrase had a restricted meaning, both in administrative interpretations and in his formal regulation, remained unchanged for six more years, during which time taxpayers continued to consummate commercial transactions in reliance thereon.

· The short of it is that the legislative history of paragraph 27 [23] has a somewhat negative quality. It does not lend any particular support to the position of the Ilustrado. But neither does it furnish any grounds for concluding that all the other factors noted herein, which overwhelmingly point to the application of *ejusdem generis*, have been overcome by this legislative history.

We examine finally the last of the guides listed above to determine if the Legislature had a clear intent against the application of *ejusdem generis*—(e), statutes *in pari materia*. The only statute we have found which has any bearing on this problem is another paragraph of § 16 of the Internal Revenue Law.[24] It began as paragraph 31; by Act No. 17 of 1927 it became paragraph 19; and in Act No. 83 of 1931 it was amended to provide for an excise tax at the same rate

---

[23] We note, in order to complete the legislative history of paragraph 27, that it became paragraph 26 by Act No. 158, Laws of Puerto Rico, 1941, without any material change. (The word ''or'' was inserted between ''ventilators'' and ''automatic apparatus'' in the Spanish text; this was not done in the English version. In any event the change is without significance here.) And, as we have already seen, Act No. 25 of 1942, Third Special Session, expanded the title of this paragraph and increased the rate of taxation provided therein, without effecting the present controversy.

[24] Act No. 77, Laws of Puerto Rico, 1944, added § 16–B to the Internal Revenue Law, providing that ''There shall be exempt from the payment of the excises imposed by this Act all machinery, apparatus, or equipment that may be essential for the establishment and operation of industrial plants . . . . .'' Although invoked by both parties, it is not in *pari materia* here; it was passed by a subsequent Legislature long after the events here and can not furnish a conclusive answer as to the meaning of the previous legislation herein. · At the most the 1944 statute evinces a desire on the part of the Legislature to promote the industrialization of Puerto Rico by sweeping away all the troublesome questions involved herein as to future transactions. But past transactions took place under earlier statutes; they are neither taxed nor exempted by the 1944 statute.

of 10 per cent "On every electrical or fluid gas apparatus for lighting or heating, including apparatuses for the interior or exterior lighting or illuminating of houses, buildings and vehicles and parts and accesories hereof . . . "[25]

But why put such a paragraph in the Internal Revenue Law by Act No. 83 if paragraph 27 was being amended by that very same Act No. 83 to include the general phrase "automatic apparatuses operated by fluid gas or electricity", which, according to the Treasurer, was so broad and unrestricted that the articles taxed by paragraph 19 were already included within the general phraseology of the amendment to paragraph 27? Obviously, the Legislature meant for the general phrase of paragraph 27 to have only the restricted meaning dictated by *ejusdem generis;* and apparently believing that electrical or gas apparatuses for lighting or heating did not come within the *genus* of paragraph 27 as amended by Act No. 83, it provided in a separate paragraph of Act No. 83—paragraph 19—for taxation therefor at the same rate of ten per cent. The Legislature, in short, found it necessary to provide in a separate paragraph for excise taxation of articles—at the same rate—which would already have been covered by paragraph 27 if we gave the latter the broad and unqualified reading for which the Treasurer contends.[26]

---

[25] Acts No. 108 of 1936 and No. 158 of 1941 amended paragraph 19, but not in any way relevant here. The latter changed the number of the paragraph from 19 to 20 and added air conditioning apparatuses as taxable articles. And by Act No. 25 of 1942 the rate of taxation in paragraph 20 was increased to 15 per cent; this same new 15 per cent rate was also prescribed for paragraph 27 (now 26) in Act No. 25.

[26] Although it cannot affect this case because it took place after the controversy herein, we note that the Legislature subsequently broadened paragraph 19 (now 20) considerably by providing for a tax "On every electrical or gas apparatus *for whatever it may be used.*" (Italics ours; Act No. 25 of 1942; Act No. 116 of 1943.) If it were pertinent to this case, which it is not, such general phraseology in a *separate paragraph,* providing for taxation at the same rate, would make it even clearer that we must reject the contention of the Treasurer that the general words of paragraph 27 have a broad and unrestricted meaning.

To agree with the Treasurer here would therefore require us to find that a paragraph of the Internal Revenue Law which was passed at the same time that "automatic apparatuses operated by gas and electricity" appeared for the first time in paragraph 27 was superfluous because the articles thereby taxed were already included within the general —and unrestricted—phraseology of paragraph 27. But we must read the paragraphs together and give some meaning to both if we can. We can therefore scarcely hold that a paragraph *in pari materia* with paragraph 27 negatives the view that *ejusdem generis* applies here and points instead to a clear intent to the contrary on the part of the Legislature.

Turning from the requirements of *ejusdem generis* as applied to the statute before us, we find that three recent cases of this court, although not directly in point, lend support to the conclusion we have reached. They all involved paragraph 8 of § 16 of the Internal Revenue Law, as amended by Act No. 108 of 1936, which provided for an excise tax "On all self-propelling vehicles and apparatuses such as automobiles, auto-wagons, trucks, locomotives, tractors, touring-cars, motorcycles (by whatever name known) including chassis, motors, auto-bodies without motors, tanks, batteries, launches with or without motors . . . "

We held in those cases that (1) a tugboat was not taxed by paragraph 8 because it was not within the purview of any of the enumerated articles (*Bull Insular Line, Inc.* v. *Sancho Treas.*, 53 P.R.R. 823); (2) an airplane was not taxable because it did not fall within the general terms "vehicles" as used in that paragraph (*Serrallés* v. *Treasurer*, 55 P.R.R. 91); and (3) a yacht was not taxable under the classification of "launches" found in the said paragraph (*Serrallés* v. *Sancho, Treas.*, 57 P.R.R. 764).

In those cases an argument might well have been made that there was a general phrase in paragraph 8—"self-propelling vehicles and apparatuses"—which brought the rule of

*ejusdem generis* into play, despite the fact that the general phrase preceded rather than followed the enumeration; that this was reinforced by the use of the phrase "such as" after the general phrase, indicating that the enumeration was only illustrative and not exhaustive, leaving room for other similar articles to come under the general phrase (cf. *Tugwell* v. *District Court, ante,* p. 213); and finally that a tugboat, a yacht and an airplane were all self-propelling vehicles of the same general kind as those specifically enumerated. But that argument did not prevail in those cases. This is particularly significant in the second case, which held that an airplane is not a "self-propelling vehicle" "such as" automobiles, trucks, locomotives, or launches, despite the fact that all of them, including airplanes, are transportation facilities. This court said in that case at p. 96: ". . . even though it is true that specific words used by the legislator to state his thought do not go before but follow the general words,[27] it is also true that a reading of the Act gives such a strong impression in the sense that it is limited to land vehicles that only by forcing the imagination could airplanes be included in it."

The three aforesaid cases in effect hold that if the Legislature chooses to particularize in listing items on which excise taxes are laid, it manifests its purpose of aiming at those particular items, and no others; consequently, that dissimilar articles, although of the same general character, do not fall within those specifically enumerated—a tugboat or a yacht is not taxable as a launch. And, most important for us here, that even the general phrase used in such a statute will not include articles not specifically listed therein, despite the fact that the articles in question fall into the same clas-

---

[27] This language intimates that the court had in mind the principle of *ejusdem generis.* To the same effect, the language in *Bull Insular Line, Inc.* v. *Sancho, Treas., supra,* at p. 825: "Very frequently it happens that a word of a very general specification is used in a specialized form, but 'the Legislature was only covering a limited part of a possible field' of operation."

sification—an airplane is not taxable as a self-propelled vehicle.

We need not go that far in this case. Here we give the general words of our statute a wide content; as we have seen, they operate to include many other articles which, though not specifically enumerated therein, are of a similar nature as those enumerated. We hold only that a rotary press is not the same kind of article as an electric fan—surely, once we conclude that *ejusdem generis* applies, there can be no quarrel with that view. To hold that the Legislature thought of them as the same kind of merchandise would indeed be "forcing the imagination". Paragraph 27 was directed at the taxation of modern gadgetry, not whole power or printing plants. And we find that a result much easier to reach than the conclusion of this court that an airplane was not included within the phrase "self-propelling vehicles and apparatuses" found in paragraph 8.

One other important factor remains for discussion—the administrative interpretations and regulations involving paragraph 27. We have concluded that there is solid reason to believe that the Legislature intended to include within the general phrase used in paragraph 27 only articles of the same kind or class as those specifically listed therein, and not other articles of a different and superior class, such as a rotary press. Nevertheless, we recognize that the matter is not free from difficulty. The point is a fairly close one, and when the general phrase was first inserted in the statute by Act No. 83 of 1931, perhaps no one would have criticized the then Treasurer if he had taken the position administratively or by regulation that heavy industrial machinery was covered by the general phrase. Then at least taxpayers would have been forewarned and the matter would have undoubtedly been settled by litigation or legislation at a reasonably early date. Instead previous Treasurers adopted an administrative practice to the effect that such machinery was covered

only by the generic 2% use tax provided in § 16a and acted accordingly for many years.[28]

In addition to the administrative practice in specific cases, we find that the Treasurer took the same position as a general proposition. On July 24, 1931, immediately after Act No. 83 of 1931—by which the phrase ''automatic apparatuses operated by fluid gas or electricity'' was inserted in paragraph 27—went into effect, the Treasurer promulgated a Regulation pursuant to the said Act. Section 8 of the Regulation listed 42 articles. The Treasurer certainly had no notion that he could include thereunder such things as a rotary press; he listed only typical household goods such as we have already described.

But most significant of all § 9 of the Regulation read as follows:

''Section 9.—*Definition of paragraphs of Section 16.* For the purposes of collection and payment of the taxes, the following paragraphs, and the manner of paying the taxes, are defined as follows:

''*        *        *        *        *        *        *

''27. *Fans and ventilators, refrigerators and electric or fluid gas stoves.* By fans and fluid gas or electric fans, refrigerators and electric or gas fluid stoves are meant all those articles which, under any name, are introduced, sold or used as such.

''There will be included under the classification of automatic apparatuses operated by fluid gas or electricity to which the Act makes reference all automatic apparatuses known as such, among them washing machines, ironing machines and vacuum cleaners.''

---

[28] For a further indication of the administrative practice of the Treasurer on this point, see *Compañía Cervecera de Puerto Rico* v. *Buscaglia,* decided today. In the instant case the administrative determination by the previous Treasurers was in favor of the Ilustrado on the basis of complete exemption. This was so clearly wrong that we have held that, despite this interpretation, the Ilustrado must pay the 2 per cent use tax of § 16a (I, *supra*), although it is not liable for any penalties (IX, *infra*.) But once we conclude that the Ilustrado is not wholly exempt, it is entitled to avail itself of the administrative position of the Treasurer that 2 per cent, and not 10 per cent, was due on heavy machinery.

Here was a contemporaneous administrative construction embodied in a formal regulation by the official charged with the enforcement of taxing statutes which his office traditionally drafts for approval by the Legislature. That regulation, so far as we are aware, has never been changed. And it makes crystal clear that the Treasury Department for many years has consistently taken the position that the "apparatuses" covered by paragraph 27 are only those of a household nature.

When a statute is clear, no taxpayer can take refuge in an administrative interpretation or regulation to the contrary. But uncertainties lurk in many words and phrases, especially those used in complicated tax legislation. The Legislature has therefore vested in the Treasurer the duty and power of promulgating Regulations which have the force of law. And it is well settled that a consistent and contemporaneous administrative interpretation and/or regulation on a close question, plus reliance thereon for a number of years by all concerned, dissipates the doubts that might otherwise have arisen as to the meaning of the statute, with the corollary that both the government and the taxpayer are bound thereby (*Pyramid Products, Inc.* v. *Buscaglia, Treas., ante,* p. 788, decided April 19, 1945; *Brewster* v. *Gage,* 280 U. S. 327, 336; *White* v. *Winchester Club,* 315 U. S. 32, 41; *Bowie* v. *Buscaglia,* 63 P.R.R. 525, 534, footnote 5; *Meléndez* v. *Registrar,* 63 P.R.R. 984, 991; *Liggett & Myers Tobacco Co.* v. *Buscaglia, ante,* p. 75; 1 Mertens, Law of Federal Income Taxation, § 3.20). The strength of this theory is enhanced in a situation where as here the Legislature reenacts the statute without substantial change after notice of the said administrative practice or regulation (*Pyramid Products, Inc.* v. *Buscaglia, Treas., supra; Commissioner of Internal Revenue* v. *Wheeler et al.,* 324 U. S. 542, footnote 10, decided March 26, 1945).

We have already indicated our view, as a matter of statutory construction, that the general phraseology of para-

graph 27 does not include a rotary press. But if any doubts still lingered in our minds, we should be compelled to put them aside in view of the unbroken administrative practice and regulation to the same effect for eleven years; the latter is the *coup de grâce* to the position of the Treasurer here. We therefore hold that the machinery involved herein is not subject to the 10% use tax provided in paragraph 27 of § 16, although, for reasons noted in IV, *infra,* it is subject to the 2% use tax laid by § 16a.[29]

## IV

■ In its original opinion and judgment the district court held that § 16a of the Internal Revenue Law, providing for a 2% use tax, applied to the articles brought into Puerto Rico by the Ilustrado, including printing presses, linotype machines, paper, ink, type lead, matrices, etc. That Section [30] read in part as follows: "There shall be levied and collected, once only, on all articles included in section 62 of this Act, a tax of two (2) *per centum ad valorem* . . . when said articles are manufactured, produced or introduced in Porto Rico for domestic use or consumption and not for commercial purposes . . ."[31]

The Ilustrado assigns this holding of the district court as error on the ground that it brought all the articles involved to Puerto Rico for commercial purposes, i.e., for utilization in the publication, dissemination and sale of its newspapers and magazine. However, to agree with the Ilustrado would

---

[29] The district court lumped into the same category as the rotary press, other printing presses and linotype machines. Nothing has been called to our attention as to why they should not be treated this way for the purposes of the instant case.

[30] Section 3, Act No. 17, Laws of Puerto Rico, 1927, Second Special Session.

[31] Section 7 of the Internal Revenue Law, Act No. 85, Laws of Puerto Rico, 1925, reads as follows: "*Definition of the words 'Use' and 'Consumption'.*—The words 'use' and 'consumption', as employed in this Act, shall be construed in their most usual meaning. When an article subject to taxation has not been acquired for sale, it shall be understood that the same is to be used or consumed by the person acquiring it."

require us to lose sight of the purpose of § 62 and 16a. After the Internal Revenue Law was enacted in 1925, it immediately became obvious that the Legislature had left a serious gap in the statute. Section 16 imposed excise taxes on the sale or use in Puerto Rico for specific articles at various rates, all higher than 2%. For all articles not covered by § 16 which were objects of commerce, § 62 provided for a generic 2% tax—but only on sales thereof in Puerto Rico. The 2% sales tax provided by § 62 could therefore easily be evaded by purchase outside of Puerto Rico for use in Puerto Rico. By Act No. 17 of 1927, the Legislature closed this gap in the statute by enacting § 16a, which provided for a general 2% use tax to complement the general 2% sales tax of § 62. It was contemplated that §§ 62 and 16a would between them provide for a sales or use tax—levied only once on the same article—at 2% for articles the sale or use of which in Puerto Rico was not specifically taxed at a higher rate by § 16.

When §§ 16, 62, and 16a, are read together with this background in mind,[32] it is clear that the phrase "not for commercial purposes" does not have the restricted meaning the Ilustrado would have us give it. We therefore do not agree that § 16a was designed solely to tax consumers who purchased articles outside of Puerto Rico for their personal needs and use here. The phrase "domestic use" meant, in this context, use within Puerto Rico rather than use in a household.[33] And likewise the phrase "not for commercial purposes" meant that the article was not covered by this Section

---

[32] Section 18 of the Civil Code (1930 ed.) provides that "Laws which refer to the same matter, or whose object is the same, shall be interpreted with reference to each other, in order that what is clear in one may be employed for the purpose of explaining what is doubtful in another." This is a codification of the rule that statutes *in pari materia* are read together to obtain their true meaning. *Flores Alvarez & Co.* v. *Gallardo*, 36 P.R.R. 105, 110. See III, *supra.*

[33] It would be captious to assert that domestic always refers to household —witness the phrase, "domestic corporation."

only if it went into the channels of commerce; that is, for sale in Puerto Rico. That would seem evident from the fact that if articles were brought here for "commercial purposes" —meaning for resale—the 2% sales tax prescribed in § 62 would be levied on the sale. Visualizing this, the Legislature intended by § 16a to provide for a use tax of all articles not taxed by § 16 which were brought to Puerto Rico and used or consumed here without a sale thereof in this jurisdiction. But it never intended to give immunity from the 2% use tax prescribed by § 16a to those who imported for use and consumption in their businesses articles which, if purchased in Puerto Rico, would have been subject to the 2% sales tax found in § 62. At least in the absence of a specific directive to that effect, we cannot hold that the Legislature deliberately proposed by § 16a to perpetuate one of the discriminations against a purchaser in the local market in favor of a purchaser outside of Puerto Rico—both of whom purchase for use in Puerto Rico—which the Section was avowedly designed to eliminate.[34] We cannot hold that the district court erred in applying § 16a to the article in question.

## V

On reconsideration the district court modified the phase of its judgment just discussed in one respect. It held that the ink and paper brought to Puerto Rico by the Ilustrado were not taxable under § 16a. The lower court concluded that paragraph 11 of § 83 of the Internal Revenue Law

[34] We find nothing in *Flores Alvarez & Co.* v. *Gallardo*, 36 P.R.R. 105, which militates against this holding. The *Flores Alvarez* case contains a dictum at pp. 107–8 that not all sales are subject to § 62, but only those which involve acts of commerce by a merchant. Whether sporadic "sales" by the Ilustrado are acts of commerce within that rule is examined in VII, *infra*. But here use, not sale, is involved. And, as we view the statute, use is taxed if the articles are brought to Puerto Rico either to be consumed by the purchaser or to be used for some business reason other than resale. The *Flores Alvarez* case therefore has no bearing on the specific problem now under consideration.

applied to these articles. That paragraph provides for an exemption of ''The sale, use or consumption of articles imported into, or manufactured in, the country, used for containers or in the presentation or preparation of products for sale or export, provided said articles pass with the product to the possession of the buyer.'' [35]

The theory of the district court was that paper and ink are used in the preparation and presentation for sale of newspapers and a magazine, and that the said paper and ink pass with the publications to the possession of the purchasers; it therefore held that the 2% use tax which would otherwise be due under § 16a did not apply to paper and ink by virtue of paragraph 11 of § 83.

We are unable to agree with this conclusion of the lower court. In its opinion on reconsideration the district court, applying the doctrine of *ejusdem generis* to paragraph 11, recognized that ''It can be easily ascertained by an examination of paragraph 11 that the specific and predominating term therein is the word 'containers', the meaning of which is well-known, and that the words 'presentation' and 'preparation' are broader in meaning. The latter must therefore be related to the former, and their meaning cannot go beyond the idea the former expresses.'' Under that reasoning, only such things as labels, wrapping paper and various decorative devices, besides containers, would seem to be encompassed by paragraph 11. But the lower court did not follow its own reasoning. Instead it simply held by what seems to us to be a *non sequitur* that paper and ink are used to prepare the publications herein and pass with them to the purchaser.

By the district judge's own test of *ejusdem generis* we believe the exemption found in paragraph 11 for articles used in the presentation or preparation of products was meant to cover only products which required containers or other de-

[35] Paragraph 11 was added to § 83 by Act No. 83, Laws of Puerto Rico, 1931.

vices to make them salable and which, although they continued to an undetermined extent to be separately identifiable from the principal commodity being sold, nevertheless went with the product to the purchaser. See *Puerto Rico Paper Bag Co. v. Sancho, Treas.,* 53 P.R.R. 738.

There is no occasion here to determine whether paragraph 11 applies if the container or other similar device, as in the sale of milk and soft drinks, by one arrangement or another finds its way back to the vendor for reuse, after it has passed into the possession or power [36] of the vendee and the main product sold has been removed or consumed. But the very fact that in other cases such a problem may well arise emphasizes the point that paragraph 11 contemplates exemption for a subsidiary sales-promoting article which retains at least to some extent its own identity rather than for raw materials like paper and ink which are the very stuff of a newspaper and which retain no identity of their own apart from the publication as such.

To "pass with" the product is not the same thing as becoming a material part of the final product. In the latter situation the material goes into rather than along with the finished product. To go along with a product, the subsidiary article must be separately recognizable and retain to some extent its own identity rather than become fused into the main article. If ordinary language is to be given its plain meaning, we cannot say that paper and ink pass with a newspaper into the possession of the purchaser. On the contrary, the commercial articles known as paper and ink disappear completely as such when consumed in the printing of a newspaper. And if more be needed, we have seen that an exemption from taxation must unequivocally apply. (See 1, *supra.*) We cannot hold that to be true here.

Nor can we follow the district court in its reasoning that the intention of the Legislature to include the paper and ink

---

[36] By the same token, whether "possession" or "power" here means "title" is not involved in this case.

involved herein under paragraph 11 can be discerned from the provisions of paragraph 9 of § 83 exempting newspapers from the excise taxes prescribed by the Internal Revenue Law. The district court held in its original judgment that only the finished product, and not the raw materials or machinery used to publish newspapers, was covered by paragraph 9. That holding was not altered on reconsideration and we have already approved it. See I, *supra*. If anything, paragraph 9 would therefore seem to point in the opposite direction: paragraph 9, dealing specifically with publications, laid down a narrow and rigid exemption; as a consequence, no other paragraph, not dealing directly with the subject matter, can be fairly read to widen that exemption, particularity if its language must be stretched beyond its ordinary meaning to accomplish that end. We agree with the Treasurer that the lower court erred in holding that the paper and ink used by the Ilustrado in printing its periodicals were exempt from the use tax provided in § 16a by virtue of paragraph 11 of § 83.[37]

## VI

Our holding that a rotary press brought into Puerto Rico and used here was taxable at 2% under § 16a rather than at 10% under paragraph 27 of § 16 (see III, IV, *supra*)

---

[37] Our Legislature has not subscribed to the proposition—except in a limited number of cases where exemptions are specifically conferred by statute—that either raw materials or the finished product should be subject to excise taxation, but not both. Some states have exempted from their excise tax statutes goods used by the purchaser in the production of other articles (See cases collected in Annotation, 139 A.L.R. 372). Those who advocate such measures assert that otherwise articles are put through the wringer of excise taxation twice, thereby giving undue importance to excise taxes which are noted for the facts that (1) they are deflationary, (2) they are almost invariably passed on to the consumer, (3) who thereby pays taxes based on need for the articles rather than, as in income taxation, on ability to pay. But this is economic theory, not law. In that field decision is exclusively within the province of the Legislature. Here we note only that citation of cases such as those found in 139 A.L.R. are not in point; as our discussion in IV and V discloses, our Legislature has in the past chosen not to travel that road. (See *Monllor & Boscio, Sucrs.* v. *Sancho, Treas., supra.*)

does not solve the problem involved in the abortive purchase by the Ilustrado of another press valued at approximately $50,000. Here the Ilustrado asserts that no tax is due even under § 16a because it never used this press in Puerto Rico.

The manager of the Ilustrado testified that it ordered a Hoe press which it planned to use to publish "Puerto Rico Ilustrado" in the style of "Life" magazine. This was delivered in January, 1936. The Hoe Company sent experts here to help set it up and operate it. But it was soon discovered that this press would not do the job for which it was ordered. The Hoe Company sent more experts, who made various experiments, including the use of different type lead and paper, all to no avail. The manager of the Ilustrado then made trips to the United States, during which he visited other publishing houses faced with similar problems. As a result of these visits, for certain technical reasons not necessary to set forth in detail here, he concluded that the Hoe press was not in conformity with the specifications of the order and was not suitable for the purposes for which it was ordered.

The manager of the Ilustrado also testified as to the arrangement under which this press had been delivered. He stated that "in accordance with the contracts publishing houses make with firms which sell presses, the machinery never passes into the possession (*poder*)[38] of the publishing house until it is accepted and it delivers a satisfactory product to the purchaser"; that this Hoe press was ordered "subject to our approval that it would deliver the contract provided for"; that because it failed to meet the tests, it "was never accepted by us"; that this press never produced a single copy of "Puerto Rico Ilustrado"; that while it was here it was never "used" in anyway except that it was

---

[38] From the context and from his other testimony, it is obvious that to the lay mind of the witness "poder", as he used it in his testimony here, meant "title" rather than mere possession.

tested to see if it could be accepted; and that the Hoe Company agreed to take it back, whereupon it was shipped back to the United States.

The district court found the foregoing testimony to be true. The Treasurer offered no testimony to the contrary. The findings of the district court are amply sustained by the testimony, and we are therefore not at liberty to reject them.[39] The Attorney General, however, brushes all these facts aside, and rests on the bare legal contention, to quote his brief, that "The act of introduction of the taxable article is what imposes the duty of paying the tax. Nor is there any provision in the Internal Revenue Law which requires the Treasurer of Puerto Rico to refund the excise tax collected for the introduction of any article taxed by the said Act, if the said article is subsequently returned by the person who introduced it."

The Attorney General rises a serious question which has been debated in this jurisdiction but never squarely decided —does the Legislature of Puerto Rico have the power to impose excise taxes on the mere introduction of goods into Puerto Rico? (Cf. *West India Oil Co.* v. *Domenech*, 311 U. S. 20; *Pyramid Products, Inc.* v. *Buscaglia, Treas., supra; The Hooven & Allison Co.* v. *Evatt*, 324 U. S. 652, decided April 9, 1945.) The Attorney General confines himself to the quoted paragraph. He cites no statutes or cases. But even if the Attorney General had briefed his case in detail, it is our view that the instant case does not call for decision of that important question.

It is sufficient in order to dispose of this case to state

---

[39] The Treasurer argues that the testimony shows an unconditional sale rather than a delivery on approval. But the only testimony on this question was that of the Ilustrado which, as we have seen, was exactly the opposite. And when on cross-examination the manager of the Ilustrado offered to show counsel for the Treasurer all the documentation in the case, the latter waived him aside, saying "That is not necessary. I am not trying to show that the witness is not telling the truth but only trying to get an explanation of his testimony."

that we believe that the Legislature never meant for § 16*a*
to apply to the circumstances herein. As we have seen, sales
in Puerto Rico were taxed by § 62; and § 16*a*, to complement
it, covered those cases where purchase was outside Puerto
Rico for use here. But that must have meant that if the
purchaser could show that the purpose for which the goods
were brought here—use in Puerto Rico—was frustrated,
§ 16*a* did not apply. We are not passing in this case on the
question of whether the Legislature has the power to impose
excise taxes on the mere act of introduction. We hold only
that the Legislature did not under the terms of § 16*a* pur-
port to exercise any such power; it specifically provided for
a tax on articles only if they were "manufactured, produced,
or *introduced in Puerto Rico for domestic use or consump-
tion.*" [40] (Italics ours.)

In the view we take of § 16*a*, it is obvious that no tax-
able event occurred here. This press was never purchased
by the Ilustrado. It was merely delivered to it on approval;
and it was never used here.[41] To hold that this transaction

[40] The proviso at the end of § 16 *a* ". . . but payment shall be made be-
fore said articles are withdrawn from the factory or from the custody of
the post office or customs authorities, or from the express or steamship
agencies . . ." does not alter this result. This was merely a highly useful
collection device for prepayment. If it were ultimately established that the
tax was not due, refund must follow.

We also think it important to note that our decision in *West India Oil
Co. (P. R.)* v. *Treasurer*, 54 P.R.R. 695, which was affirmed in 311 U.S. 20,
is clearly distinguishable. There we held that gasoline sold for use on the
high seas by ships departing from Puerto Rico was taxable as a sale in Puerto
Rico under § 62. The theory of our opinion in that case was that despite
the fact that the contract of sale was made in New York, the sale was con-
summated, for tax purposes, in Puerto Rico by unconditional delivery and
acceptance here. Section 16 *a* was in no way involved in that case and was
not mentioned in our opinion. On the other hand, the question now before
us is whether the use contemplated by § 16 *a* as the taxable event has taken
place in Puerto Rico under the circumstances herein. See *Pyramid Products,
Inc.* v. *Buscaglia, Treas., supra.*

[41] In addition to the testimony already noted to that effect, on cross-
examination the manager of the Ilustrado testified as follows: "Q.—How long
was this machinery in use in Puerto Rico? A.—I do not accept the word
'use.' I would say that more than a year was spent setting it up, testing
it, dismounting it and packing it, but it never produced a magazine for sale."

was taxable under § 16a would be to find that the Legislature meant that every time a local merchant—or an individual for his personal use—received on order subject to approval a large stock of articles not in accordance with the specifications of the order, resulting in their rejection and return, the local prospective purchaser would be required to pay thereon excise taxes. And if there were a series of shipments and rejections under a single order, a tax would be due on each occasion under this theory.

The tax results envisaged in the preceding paragraph could be reached only if the Legislature attempted to make introduction without more the taxable event. It will be time enough to consider the alleged power of the Legislature to enact such a statute when a case involving one reaches us. Here we are concerned only with § 16a, which provides for taxation only in the event of introduction plus use; or, to put it another way, this is a tax on use in Puerto Rico after an article has been introduced into Puerto Rico. And use in this statute is a word with an economic background: it contemplates benefit or satisfaction which arises when the article is put to work for the purpose for which it was produced. Use, in short, means something more than testing an article, finding it unsatisfactory, and returning it—without any use whatsoever in the economic sense—to a prospective vendor who had forwarded it, not by virtue of an unconditional sale, but only on approval with the understanding that the sale was not to be considered as consummated until the article was tested, approved and accepted.

Section 62 provides for a tax of 2% on sales in Puerto Rico. No one contends that the Hoe press was sold in Puerto Rico. Section 16a, to prevent evasion of § 62, provides a 2% tax on articles purchased outside Puerto Rico but used here. But since we have concluded that the use contemplated by the Legislature did not take place, § 16a is also inapplicable here.

The fact that the press was in Puerto Rico for more than a year does not affect the result in this particular case. The testimony was uncontradicted that this time was consumed in mounting the machinery, making test runs, waiting for experts who made new tests, etc. There was no showing by the Treasurer that the time the Ilustrado took to determine if it would accept the press was unreasonable under the circumstances. And there was affirmative proof by the Ilustrado that the press was never actually used to produce anything. One could not, of course, have a suit sent from New York, wear it six months, return it on the contention that it was not acceptable, and thereby escape the use tax thereon provided in § 16a. A few minutes are enough to try on a suit. But complete tests of ponderous machinery, shipped by manufacturers thousand of miles from this under-industrialized island, may easily consume many months, as it did here. We cannot find that an unreasonable time elapsed under the recited conditions. There was therefore no use of this press in the manner contemplated by § 16a, which makes use after introduction the taxable event.

Nor do we find the significance attributed to it by the Treasurer in the fact that under the arrangement whereby this press was returned to the Hoe Company the Ilustrado made a payment of $16,000. Shipping costs two ways on an article of this size are undoubtedly high; the salaries and expenses in sending experts here were substantial; expensive machinery was immobilized for more than a year; and the Hoe Company always insisted that the press would ultimately be substantially satisfactory.

Neither party wanted to buy a law suit. In an effort to avoid litigation, the settlement in question was reached, the Hoe press was returned, releasing valuable space it was taking in the press room, and the Ilustrado, which had long done without a press it needed, purchased a different press. Both parties undoubtedly took a loss on the transaction. They probably preferred this to the delay and publicity of litiga-

tion which for at least one of the parties would have been conducted far from home. But to make the transaction taxable we would be required to find: (1) the Ilustrado bought the press; (2) it used it for the production of periodicals; (3) it resold it to the Hoe Company. Those facts simply did not occur, and we shall not conjure them up out of thin air.

The Attorney General also advances the theory that this was a contract of sale which was rescinded upon payment of $16,000 by the Ilustrado to the prospective vendor. But even this be the correct legal label for the transaction—the documents which would have clarified this point, although offered to counsel for the Treasurer by the manager at the trial, were never introduced in evidence— we fail to see how it helps the case of the Treasurer here. We know of no provision of the Internal Revenue Law which taxes contracts of sales made in the United States for shipment of goods on approval to Puerto Rico which, instead of being consummated, are rescinded before title to the articles involved has passed to the prospective purchaser in Puerto Rico. There was no unconditional delivery and acceptance, amounting to consummation of a sale here, as occurred in *West India Oil Co.* v. *Domenech, supra.* Under the terms of the contract of sale herein—found as a fact by the district court on uncontradicted testimony—if the press had been delivered, tested, approved and title thereto taken by the Ilustrado, the taxable event of use in Puerto Rico would thereafter have arisen. But since such use, as we have seen, did not occur here, and since no sale here likewise occurred, we are unable to see what taxable event covered by § 16a —or any other Section—occurred as a result of rescission of the original contract of sale. The payment by the Ilustrado to settle amicably the dispute as to (1) shipping charges, (2) expenses of experts sent by the Hoe Compay and (3) the performance of the press, has no bearing on the matter. To hold otherwise would be tantamount to a ruling that one

who contracted in New York to buy an automobile and then repented would, if he paid $500 to obtain rescission of the contract, be required to pay excise taxes therefor in Puerto Rico even though he never obtained title or use of the car.[42]

The district court did not err in holding that no excise tax was due by virtue of the unsuccessful effort of the Ilustrado to buy a Hoe rotary press.

## VII

▪ There remains for consideration the comparatively small amount of paper, ink, etc., worth approximately $35,000, which the Ilustrado "sold"—sometimes, according to the testimony, without receiving payment—to competitors as a matter of accommodation. These occasional transactions took place over a period of seventeen years, the supplies therefor coming from the large emergency stocks the Ilustrado always kept on hand for its own use. The district court held that the Ilustrado was not in the business of selling, and that these transactions were therefore not taxable under § 62.[43]

That holding would ordinarily raise serious questions. Section 62 contains no provision that the vendor must be engaged exclusively in the business of selling. Indeed, as the district court itself points out, the Ilustrado paid without protest sales taxes on its occasional sales of photographs taken and developed primarily for publication in its periodicals. Section 62 requires only that there be "the

---

[12] The Legislature has had its attention called to this problem. It has provided that even in the case of an *unconditional* sale, where title has already passed to the vendee, articles which after receipt in Puerto Rico are returned to the vendor within ten days, or are received in a damaged condition, are not taxable to the purchaser (§ 2, Act No. 77, Laws of Puerto Rico, 1944, adding § 16–C to the Internal Revenue Law). *A fortiori*, articles shipped on approval and never accepted by a purchaser under a contract of sale specifically providing such terms and never used in Puerto Rico are not taxable.

[13] Section 62 was amended by Act No. 17, Laws of Puerto Rico, 1927, in a manner not relevant herein. From 1927 until its repeal by Act No. 29, Laws of Puerto Rico, 1941, it remained unchanged.

sale of any articles the object of commerce". Moreover, the failure to collect the purchase price from the vendee does not bar collection of the sales tax from the vendor: § 62 requires payment of the tax "at the end of each month by the person making such sales" "whether such sales are for cash or on credit".[44]

On the other hand, there are statutes in some states which specifically exempt casual and isolated sales by a vendor not engaged in the business of selling tangible personal property (139 A.L.R. 372). And we have in the past recognized some limitations on § 62, although we have never spelled out this concept in detail. In *Flores Alvarez & Co.* v. *Gallardo*, 36 P.R.R. 105, this court said at pp. 107-8: "However, we have no doubt that the tax does not apply to all sales. Section 62 says: 'On the sale of any articles, the object of commerce.' . . . 'The object of commerce' makes a sufficient segregation of sales. . . . Innumerable sales of personal property may be made in Porto Rico and not be acts of commerce. Practically every act done by a merchant, however, in his business is the object of commerce."

However, we need not make a final determination as to the correctness of the holding of the district judge on this point. He was compelled to examine it because he concluded that the use tax prescribed in § 16a did not apply to the general stock pile of paper and ink. But we have held that he was in error in this respect. And once we conclude that use of such materials brings the 2% use tax of § 16a into play, the Ilustrado can scarcely assert that it neither sold nor used in Puerto Rico the articles in question. If it is invoking a sort of *de minimus* doctrine for these occasional sales, then these items have never been detached from the main stream of Ilustrado's supplies to which the 2% use

[44] The excise taxes provided in our Internal Revenue Law bear no relation to profits, which are reached through a different form of taxation—the income tax.

tax of § 16*a* applies as a whole. And so far as its failure to collect for some of the "sales" is concerned, the Ilustrado may if it chooses play the role of a good Samaritan—but its largesse cannot include the government's tax stake in the transactions.

The short of it is that we are not called on to decide in this case which theory must prevail. These articles were brought here by the Ilustrado. They did not thereafter disappear into thin air. The Ilustrado either used them to fashion its periodicals—or it sold them. Section 7 of the Internal Revenue Law prevents any legal hocuspocus by which, under some ingenious theory that goods were brought here neither for sale nor use, excise taxes are avoided. That Section provides that "When an article subject to taxation has not been been acquired for sale, it shall be understood that the same is to be used or consumed by the person acquiring it."

It is therefore sufficient for us to say that under one theory or the other—but only once, since both §§ 62 and 16*a* provide that the excise taxes imposed therein must be paid only once—the government is entitled to a 2% excise tax. Only if §§ 62 and 16*a* provided different rates—which they do not—would we be required to determine under the peculiar circumstances herein whether the use (§ 16*a*) or the sales (§ 62) tax applies. This suit is over money, not labels. We have found the money to be due. We need go no further. The district court therefore erred in requiring refund of the 2% tax paid on these items.

## VIII

The Treasurer demanded payment of the taxes herein in 1942 under certain Sections of the Internal Revenue Law already discussed in detail. But those Sections were repealed by Act No. 29, Laws of Puerto Rico, 1941, which did not contain a specific saving clause as to taxes due thereunder but not yet collected. The Ilustrado therefore claims

that its liability for the taxes and penalties involved herein, even assuming any ever existed, was wiped out by the repealer statute. The district court held to the contrary, relying on § 386 of the Political Code, enacted in 1902, which reads as follows:

"The repeal of any statute by the Legislative Assembly shall not have the effect to release or extinguish any penalty, forfeiture or liability incurred under such statute, unless the repealing act shall so expressly provide and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability."

As 1 Sutherland, *supra,* points out at p. 522, repeal of a statute destroys its effectiveness *in futuro,* and divests the right to proceed under the statute which, except as to proceedings past and closed, is considered as if it never existed.[45] But this same Section lays down an important qualification: the said principle does not govern where a saving clause in the statute itself or *a general saving statute* exists. And "a majority of the jurisdictions in the United States have enacted general saving statutes with the express purpose of achieving a continuance of the repealed statute in respect to past activity and pending legal actions."[46] Such a general saving clause avoids the harsh and unjust result which "is illustrated by the loss of accrued rights and pending actions and the inability of the state and federal governments to prosecute a known law violator once the statute upon which the actions or prosecutions depend is repealed. *State ex rel.. Osage County Savings and Loan Ass'n.* v. *Worten,* 167 Okla. 187, 29 P.(2d) (1933). Where a general saving statute exists, it furnishes the true guide for determining the effect of a repeal. *Merlo* v. *Johnson City & Big Muddy Coal and Mining Co.,* 258 Ill. 328, 101 N. E. 525 (1913)."[47]

---

[45] See cases cited in footnote 2, 1 Sutherland, *supra,* p. 523.

[46] 1 Sutherland, *supra,* p. 530.

[47] 1 Sutherland, *supra,* p. 530–1, footnote 1.

Sutherland concludes (pp. 531-2) that "Where a statute is repealed, a general saving statute operates to save any substantive right of a private nature, liability, right of action, penalty, forfeiture, or offense which has accrued under the repealed statute." See cases cited in footnote 4, p. 532.

We are therefore unable to agree with the argument of the Ilustrado that § 386 of the Political Code did not operate to continue liability for taxes and penalties allegedly due under the repealed Sections of the Internal Revenue Law. Section 386 is drawn in the classical form of general saving statutes. It is an almost exact copy of the Federal statute, which was construed in *Hertz* v. *Woodman,* 218 U. S. 205, to save the cause of action for taxes and penalties under such circumstances. The state cases—listed in 1 Sutherland, *supra*—against the contention of the Ilustrado are overwhelming. Indeed, this is precisely the kind of case § 386 was designed to cover.

The fact that on other occasions the Legislature enacted specific saving clauses in repealer statutes (§ 5, Act No. 17, Laws of Puerto Rico, 1927 (Second Special Session); § 7, Act No. 83, Laws of Puerto Rico, 1931) does not have the significance attributed to it by the Ilustrado. The Legislature apparently took this action out of an abundance of caution. Even without such special saving clauses, the general saving statute, embodied in § 386, would have taken care of the situation. "Plainly, the explicitness was one of cautious redundancy to prevent 'subversion of the legislative intent.' " *Merril* v. *Fahs,* 324 U.S. 308, 312, decided March 5, 1945.

We also fail to see how the argument of the Ilustrado that a previous Legislature cannot bind a subsequent Legislature has any relevancy here. That is, of course, an obvious proposition. But the point is that the subsequent 1941 Legislature did not purport to repeal or modify the Act of 1902. It was silent on that question. That silence left the 1902 general saving statute intact. It is therefore applicable

here. The district court did not err in holding that the repealer statute—Act No. 29 of 1941—did not relieve the Ilustrado of taxes and penalties due under the Sections repealed by Act No. 29.[48]

## IX

The penalties which the Ilustrado was required to pay would as to some items have to be eliminated and as to others considerably reduced, in view of our finding that some of the articles were not taxable and that others were taxable at 2% rather than 10%. But the Ilustrado raises a more fundamental question—could the Treasurer exact any penalties at all under the circumstances of this case?

The manager of the Ilustrado testified that the question of its liability for excise taxes had been raised by a number of Treasurers—Messrs. Gallardo, Domenech, and Sancho Bonet—before the present incumbent took office; that "Each time the Treasury Department inspectors come to our offices they examined our files and took our bills of lading and we filled out a form which said that so and so bills of lading covered importations made by Puerto Rico Ilustrado, Inc., for publication of the newspaper and no internal revenue taxes had been paid on it because it was exempt by law. Q.—When notified by the Treasurer, you contended that you were not obliged to pay and the Treasurer did not insist? A.—Yes, sir. Q.—Until you received that letter of August 1942? A.—Yes, sir."

Counsel for the Ilustrado also testified that, as a result of the questions raised by the then Treasurers, he took up

---

[48] This court held in *The Texas Co.* v. *Treasurer*, 50 P.R.R. 415, 431, that "when a statute imposing penalties on taxpayers in default is repealed, said penalties are assessable no longer and that the right to recover penalties imposed prior to the repeal of said act is lost unless such right is expressly reserved by the repealing act." That statement of the law must be completed by adding the phrase "or by a general saving statute." And § 386, which was not considered in the *Texas Co.* case, as we have seen, is such a general saving statute. To this effect, see also, *People* v. *Rodríguez*, 50 P.R.R. 34, 38; *People* v. *Valentín*, 33 P.R.R. 39.

the matter personally with Messrs. Domenech and Sancho Bonet and submitted memoranda to them in connection therewith. The Treasury Department thereupon desisted from their efforts to collect the same.

The Treasurer did not challenge this testimony in any way. The district court believed it. The Treasurer does not attack it here. We must therefore accept it as true. Indeed, the nature of this large enterprise, its volume of importations, and the Federal statute making available to Treasury inspectors the cooperation and facilities of the postal and customs service for enforcement of the insular Internal Revenue Law (Title 48, § 741a U.S.C.A.) would have made dubious any testimony, which was not offered, that the flow of these articles into Puerto Rico from 1925 to 1942 had escaped the attention of the Treasury Department.

We have already rejected the argument that materials and machines used to publish newspapers are wholly exempt from excise taxation. But the Ilustrado certainly had a right to make that contention when the matter first came up. And its testimony is uncontradicted that, however informally it may have been done, succesive Treasurers agreed with this contention until 1942.

We think it important to note at this point that there was no formal regulation exempting newspapers from excise taxes or even a firm administrative practice to this effect. If this were true, the Ilustrado might conceivably claim exemption from the taxes as well as the penalties therefor. See last portion of III, *supra*.[49] But the Ilustrado does not invoke the past actions of the Treasury Department to avoid

[49] We say the Ilustrado might "conceivably" make this claim because there might be an additional barrier here. Even if a firm administrative practice were proved, the Ilustrado would have to show in addition that the statute was doubtful or ambiguous; no Treasurer can read a clear section out of a statute by administrative practice. See I and III, *supra*. But, as noted in the text we never reach that question here because the Ilustrado relies on the attitude of the Treasurer solely to block collection of penalties, and not the taxes themselves.

payment of the taxes. At this stage of the case, it relies on that pattern of conduct only in support of its position that penalties cannot be collected, although conceding liability for taxes. And it "is not the purpose of the law to penalize frank differences of opinion or innocent errors made despite the exercise of reasonable care." *Spies* v. *United States,* 317 U. S. 492, 496.

We recently examined this question extensively in *West India Oil Co.* v. *Buscaglia, Treas.,* 61 P.R.R. 755. We therefore see no purpose in restating in detail the reasons which motivated us in holding there that the Legislature did not intend for the penalty—which consists of payment of 10% of the amount of the tax plus interest at 1 per cent a month—to be imposed under the unjust and oppressive circumstances of that case. (See Annotation, 137 A.L.R. 306.)

The facts were stronger in the *West India* case than in the instant case. There liability for the tax was originally more doubtful than here, and the assurances of the Treasurer of non-liability were apparently given affirmatively in more positive fashion than in the instant case. Nevertheless, the essential factors leading to the result we reached there are present here. For 17 years—the period was 15 years in the *West India* case—the Treasurer took the position here that no taxes were due and (61 P.R.R. at 764) "in harmony with that opinion, during that long period of time no attempt was ever made to levy or collect said tax. If those facts are accepted as true, how could we require that the plaintiff should have paid that tax under protest to avoid the penalty when the Treasurer himself, charged with the collection thereof, insisted that the plaintiff did not owe such tax?" And, as pointed out on p. 765, for the Treasurer to rule that no tax is due, makes a tender of payment useless; only if the Treasurer will accept payment, does a taxpayer have the opportunity to pay under protest, which is the only other method available to avoid penalties.

We are aware that this is a border line case. And we confine our holding to the facts of this case. But three successive Treasurers who had authority to do so ruled in effect over a period of seventeen years that no taxes were due in this honestly debatable situation, and that they would refuse any tender thereof if made. As we pointed out in another connection in III, *supra,* if any one of the previous Treasurers had taken a contrary position, "then at least taxpayers would have been forewarned and the matter would have undoubtedly been settled by litigation or legislation at a reasonably early date." Here we are compelling the taxpayer to pay at this late date all these back taxes, despite the aforesaid conduct of the previous Treasurers. But to require under these circumstances that the taxpayer pay in addition penalties which total approximately twice the taxes themselves would be to distort the meaning of the penalty provisions of the statute as spelled out in the *West India* case and to condone a practice unworthy of the great government of Puerto Rico *vis á vis* its private citizens.

We need hardly add that our holding by no means applies to all other cases involving penalties for failure to pay excise taxes. The obligation is in the first instance on the taxpayer to pay the tax. He cannot simply neglect to pay the same, and then plead his alleged good faith when the Treasurer after investigation demands payment. There must be a substantial question [50] involving liability for the taxes; and the Treasurer must have assured the taxpayer over a long period of time of his non-liability therefor. Only then could the conduct of the taxpayer be characterized as an "innocent error made despite the exercise of reasonable care".

---

[50] If the Treasurer had rejected the claim of general exemption, the Ilustrado could have then raised the even more substantial question that the bulk of the taxes involved here, on hundreds of thousands of dollars of importations, were payable at 2 per cent, and not 10 per cent, as the Treasurer was contending. Indeed, we have held here that the Ilustrado was right in this contention, and not merely that the question it raised was substantial.

It remains only to note that, once the Ilustrado was aware that the position of the Treasury Department had been changed by the new Treasurer in 1942, penalties could be imposed for failure thereafter to pay the taxes in question. *West India Oil Co.* v. *Buscaglia, Treas., supra,* p. 768. But here, as we have seen, the Ilustrado promptly paid under protest the amount demanded by the Treasurer in 1942. The district court therefore acted correctly in ruling that no penalties could be exacted under the circumstances of this case.

## X

We deem it advisable to note that two matters on which testimony was taken were not discussed by the district court. Since the briefs of both parties are silent on these matters, we likewise do not pass on them. They are: (1) the alleged practice of adding 20% to the invoice price before calculating the tax and (2) the dispute as to whether certain electrical products were bought by the Ilustrado locally after the excise taxes due thereon had been paid by the importers, or whether the Ilustrado had purchased the said articles in New York and were liable for the excise taxes thereon when they were delivered to it here.

Also, the Treasurer assigned as error the alleged ruling of the district court that ''none of the articles introduced by the plaintiff are mentioned in the various paragraphs of § 16 of the Internal Revenue Law or in any of the other different Sections of the said Act''. It is true that early in its opinion the district court makes a general statement along the lines indicated in the said assignment of error. But the only items discussed specifically in the opinion of the lower court are those we have examined herein. And there is nothing in detail in the judgment on the point, although the lower court does perhaps pass on it by implication in finding only §§ 16a and 62 generally applicable herein.

The Ilustrado does not discuss the matter in its brief. The Attorney General confines himself to asserting that, in order to show that the different paragraphs of § 16 apply thereto, "it is sufficient to refer to the transcript of evidence, pp. 121 to 155 . . ." The evidence referred to is a twenty-three page exhibit of the plaintiff (ending at p. 135 and not at p. 155) listing a conglomeration of articles, for the most part cryptically described in a way that furnishes no clue as to their identity. Although the parties give us no information thereon, apparently the great majority of the items are already covered by our specific rulings herein. But even if we knew what these hundreds of articles really were, we could determine if the various higher rates of taxation provided in the different paragraphs of § 16 applied thereto—instead of the generic 2% tax of §§ 16a and 62—only by attempting to classify each article under a specific paragraph as it read the year the article was brought here. That is a task which we prefer not to undertake without some argument thereon by counsel, particularly as the district court did not specifically pass on this point item by item in its judgment. If the parties remain in disagreement on this problem, they may present the question in detail to the district court after we remand the case.

## XI

We come finally to the problem of framing our judgment. The district court did not enter judgment for refund of a specific sum of money. Instead it ordered the Treasurer to calculate and return the excise taxes collected herein pursuant to (a) paragraph 27 of § 16; (b) § 62 on transfers by the Ilustrado to competitors of articles used in the publication of its periodicals; (c) §§ 16a and 62, on paper and ink; and (d) all penalties. The judgment of the district court also denied in general terms the prayer of the Ilustrado for refund of the 2% tax paid on other articles pursuant to §§ 16a and 62.

For the reasons stated herein, (a) and (d) will be affirmed, with the clarification, which is perhaps unnecessary, that a tax of 2% pursuant to § 16a must be paid on all articles covered by (a). But (b) and (c) will be reversed. Instead, it will be provided, as to (b), that the Ilustrado must pay a 2% tax on all articles transferred to others for use in the publication of periodicals; and as to (c), that a 2% use tax must be paid pursuant to § 16a on paper and ink. A new provision, apparently omitted by inadvertence, will be added that refund shall be made of all taxes paid in connection with the Hoe press.

As thus modified, the judgment will be affirmed, and the case will be remanded for the appropriate calculations, and for further proceedings not inconsistent with this opinion.